UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

FRANCES BORELLI,

                          Plaintiff,

v.                                              3:14-CV-1402
                                                (GTS/WBC)
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

LACHMAN & GORTON                                PETER A. GORTON, ESQ.
  Counsel for Plaintiff
1500 E. Main St.
P.O. Box 89
Endicott, NY 13761-0089

U.S. SOCIAL SECURITY ADMIN.                     ANDREEA LECHLEITNER, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
  Counsel for Defendant
26 Federal Plaza – Room 3904
New York, NY 10278

William B. Mitchell Carter, U.S. Magistrate Judge,

## REPORT and RECOMMENDATION

        This matter was referred for report and recommendation by the Honorable Judge

Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local

Rule 72.3(d).  (Dkt. No. 12.)  This case has proceeded in accordance with General

Order 18.

        Currently before the Court, in this Social Security action filed by Frances Borelli

("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the

Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-

motions for judgment on the pleadings. (Dkt. Nos. 10, 11.) For the reasons set forth below, it is recommended that Plaintiff's motion be denied, and Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on March 30, 1977. (T. 211.) She completed high school and took nursing courses at BOCES. (T. 201.) Generally, Plaintiff's alleged disability consists of back, neck, and shoulder impairments; arthritis; post-traumatic stress disorder ("PTSD"); anxiety; and borderline personality disorder. (T. 200.) Her alleged disability onset date was November 1, 2010, which Plaintiff amended to her application date of November 8, 2012. (T. 211, 49.) She previously worked as a housekeeper/cleaner. (T. 202.)

### B. Procedural History

On November 8, 2012, Plaintiff applied for a period of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (T. 211.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On June 5, 2014, and for a supplemental hearing on August 7, 2014, Plaintiff appeared before the ALJ, Marie Greener. (T. 29-45, 46-67.) On September 15, 2014, ALJ Greener issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 8-28.) On October 17, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-6.) Thereafter, Plaintiff timely sought judicial review in this Court.

## C.    The ALJ's Decision

Generally, in her decision, the ALJ made the following five findings of fact and conclusions of law.  (T. 13-23.)  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 8, 2012.  (T. 13.)  Second, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spine, a depressive disorder, an anxiety disorder, and a personality disorder.  (*Id.*)  The ALJ determined that Plaintiff's poly-substance abuse, laceration of the upper arm, shoulder pain, bilateral leg pain, and urinary tract infections were non-severe impairments.  (T. 14.)  Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1.  (T. 14-17.)  Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform: light work; however, Plaintiff was limited to unskilled low-stress work, defined as work with routine daily tasks that do not significantly change in pace or location on a daily basis, and which does not ordinarily require confrontation with others such as arguing with customers or restraining and detaining individuals, and Plaintiff was able to occasionally interact with the public.  (T. 17.)[1]  Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform.  (T. 21-22.)  Specifically, based on vocational expert ("VE") testimony, the ALJ determined Plaintiff could perform work as a

---

[1]        Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 416.967(c).

housekeeper (DOT 323.687-014), mail clerk in a business setting (DOT 209.687-026), and routing clerk (DOT 222.687-022).  (*Id.*)

## II.    THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A.    Plaintiff's Arguments

Plaintiff makes five separate arguments in support of her motion for judgment on the pleadings.  First, Plaintiff argues the ALJ "improperly weigh[ed] the medical evidence and consequently [did] not properly determine the full extent of the psychological impairments."  (Dkt. No. 10 at 11-15 [Pl.'s Mem. of Law].)  Second, Plaintiff argues the ALJ did "not properly consider diminishment in the ability to consistently work and consequently [did] not properly find Plaintiff [not] disabled based upon the testimony of the vocational expert."  (*Id.* at 15-18.)  Third, Plaintiff argues the ALJ failed "to consider whether Plaintiff [had] a somatic disorder and whether the aforesaid somatic disorder would either meet a Listing or produce additional limitations on Plaintiff's RFC."  (*Id.* at 18-19.)  Fourth, Plaintiff argues the ALJ "did not properly assess Plaintiff's psychological impairments and include the resulting limitations in [her] RFC determination."  (*Id.* at 19-22.)  Fifth, and lastly, Plaintiff argues the ALJ "improperly conclude[ed] that Defendant sustained her step [five] burden."  (*Id.* at 22-24.)

### B.    Defendant's Arguments

In response, Defendant makes three arguments.  First, Defendant argues the ALJ reasonably found that Plaintiff retained the mental RFC for unskilled, low stress work, that required only occasional contact with the public.  (Dkt. No. 11 at 5-17 [Def.'s Mem. of Law].)  Second, Defendant argues the ALJ reasonably found that Plaintiff

retained the RFC for light work. (*Id*. at 17-22.) Third, and lastly, Defendant argues the ALJ properly relied upon VE testimony at step-five. (*Id*. at 22-23.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both

sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B.    Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act.  *See* 20 C.F.R. § 416.920.  The Supreme Court has recognized the validity of this sequential evaluation process.  *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).  The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the

claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

## IV.    ANALYSIS

For ease of analysis, Plaintiff's arguments will be addressed in a consolidated manner.  Plaintiff essentially challenges the ALJ's mental RFC determination on varying fronts.  Plaintiff's first argument focuses on the weight provided to the medical opinion evidence in the record; specifically, Robert Russell, Ed.D., Cheryl Loomis, Ph.D., Sarah Harding, L.C.S.W., and E. Kamin, Ph.d.  Plaintiff's second argument alleges the ALJ "ignored" opinion evidence from Dr. Kamin, Ms. Harding, and Dr. Loomis which Plaintiff argues indicated she had a diminished ability to adhere to monthly work attendance requirements and complete tasks in a timely manner.  Plaintiff's third argument turns to Plaintiff's somatic disorder, which Plaintiff argues the ALJ failed to consider throughout her decision.  In her fourth argument, Plaintiff again states that the ALJ erred in the weight afforded to medical sources in the record specifically regarding Plaintiff's limitation in the areas of social functioning and concentration, persistence, and pace. Plaintiff's fifth argument alleges the ALJ's step five determination was not supported by substantial evidence because the hypothetical posed to the VE did not provide an accurate representation of Plaintiff's limitations.

### A.    Whether the ALJ Properly Considered the Medical Opinion Evidence in the Record

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 11 at 4-21 [Def.'s Mem. of Law].) The Court adds the following analysis.

The relevant factors considered in determining what weight to afford an opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. § 416.927(c)(1)-(6). When the opinion is provided by a treating source, the opinion may be given controlling weight. The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* at § 416.927(c)(2).

The following factors must be considered by the ALJ when deciding how much weight the opinion should receive, even if the treating source is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 416.927(c)(2). The ALJ is required to set forth his reasons for the weight he assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (*quoting Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998)).

i.)     Robert Russell, Ed.D.[2]

---

[2]     The record indicated that Dr. Russell was a New York State licensed psychologist. (T. 365.)

Dr. Russell met with Plaintiff twice in May of 2011 after she was released from her inpatient psychiatric treatment. (T. 350-352.)[3] At that time, Dr. Russell observed that Plaintiff's appearance was appropriate, her hygiene was good, her attitude was cooperative, her energy/attention was distractible, her social skills were average, her motor skills were normal, her emotion expression was labile, her mood was depressed and irritable, her speech was pressured, her thought process was coherent, her memory was good, her intellect was average, and her insight and judgment were poor. (T. 351-352.) Dr. Russell observed Plaintiff was "very emotionally labile and almost anything would bring her to tears." (T. 352.) Dr. Russell recommended therapy, which "might be helpful in motivating [Plaintiff] to seek treatment for her substance problems." (*Id.*)

Dr. Russell met with Plaintiff again in October of 2012 for a psychological evaluation. (T. 359-365.) Dr. Russell noted that "[a]s with her evaluation in May of 2011, [Plaintiff] was emotional labile during the session and was in tears throughout most of it." (T. 362.) Dr. Russell observed that Plaintiff blamed others for her difficulties and avoided personal responsibility. (*Id.*) Dr. Russell observed that Plaintiff showed no evidence of a thought disorder. (*Id.*)

_____

[3]     On May 4, 2011 Plaintiff was admitted to the psychiatric unit at Binghamton General Hospital, she was discharged on May 14, 2011. While there Plaintiff received treatment from Inna Factourovich, M.D. and Michael Sabatino, M.D. (T. 331-338.) Plaintiff was admitted due to her depression, anxiety, and thoughts of suicide. (T. 331.) Dr. Factourovich noted Plaintiff responded well to treatment. (T. 331.) Plaintiff's mental status examination on discharge indicated Plaintiff was cooperative, had good eye contact, and engaged in conversation. (*Id.*) Dr. Factourovich noted Plaintiff's speech was spontaneous, fluent, of good volume, logical, and reflective. (*Id.*) Dr. Factourovich noted Plaintiff's affect was bright and euthymic, but somewhat anxious. (*Id.*) Dr. Factourovich noted Plaintiff's insight was fair, her judgment was good, and her impulse control was improved. (T. 331.) Plaintiff was discharged in stable condition with follow up appointments scheduled at the outpatient mental health clinic and a substance abuse treatment center. (T. 332.) Dr. Russell saw Plaintiff on May 20th and 24th of 2011 for a psychiatric referral from Binghamton General Hospital. (T. 350-352.) The record indicated Plaintiff was admitted to Binghamton General Hospital again on December 6, 2011, Plaintiff was discharged the next day. (T. 346-349.)

Dr. Russell administered a Personality Assessment Inventory exam and indicated that the exam results were valid; however, he did note Plaintiff may have been slightly exaggerating her complaints and symptoms, but there was no evidence of malingering.  (T. 362.)  Based on the exam results, Dr. Russell opined Plaintiff would experience high levels of anxiety, would find it difficult to relax, and was always under some sort of stress.  (*Id.*)  Dr. Russell stated there was no evidence of manic symptoms, but as a result of her depression and anxiety, she would have difficulties in concentrating.  (T. 363.)  Dr. Russell opined that due to Plaintiff's personality disorder she would have poor emotional self-regulation and have high levels of affective instability.  (*Id.*)  Dr. Russell further opined Plaintiff would have rapid mood swings.  (*Id.*)

In his summary, Dr. Russell concluded test results supported the conclusion that Plaintiff "likely" met the criteria for PTSD and somatization disorder.  (T. 363.)  Dr. Russell stated that in his career he had "rarely met anyone as emotionally labile as [Plaintiff] suggesting that her problems are much more than those that can be attributed to depression or a borderline personality disorder."  (*Id.*)  Dr. Russell opined that Plaintiff's history of "huffing" was responsible for Plaintiff's "high" degree of emotional lability.  (*Id.*)[4]  Dr. Russell elaborated, stating that Plaintiff's borderline personality disorder contributed to her poor emotional self-regulation, but huffing made the condition much worse.  (T. 363-364.)

Overall, Dr. Russell opined that even if Plaintiff's substance abuse was in full remission she would continue to experience "significant emotional instability . . . that it

---

[4]    Huffing is the term used to describe any type of inhalant abuse.  Common inhalants are hair spray, room deodorizer, cooking spray, correction fluid, glue, rubber cement, paint thinner, and cigarette lighters.  http://www.mayoclinic.org/healthy-lifestyle/tween-and-teen-health/in-depth/inhalant-abuse/art-20044510

would interfere with her ability to work." (T. 364.) Dr. Russell opined her somatization disorder, in addition to her other mental impairments, would make her "prognosis for gainful employment in any field . . . very poor." (*Id.*)

The ALJ afforded Dr. Russell's opinion "minimal weight." (T. 20.) The ALJ provided two reasons in support of her determination: 1) Dr. Russell's report was inconsistent with Plaintiff's global assessment of functioning ("GAF") score of 60 and 2) Dr. Russell failed to provide a "full or appropriate function-by-function assessment of [Plaintiff's] mental work-related abilities. (T. 20.)[5]

The ALJ took the length and nature of Dr. Russell's treatment history into consideration in her weight analysis. The ALJ referred to Dr. Russell as "a psychologist who examined [Plaintiff] once for a disability referral." Dr. Russell did evaluate Plaintiff on three occasions, twice in May of 2011, and once in October 2012. The ALJ's decision indicated the ALJ reviewed Dr. Russell's 2011 notations; however, only afforded weight to the 2012 evaluation. (T. 16, 20.)[6] Dr. Russell's 2011 notations were over a year prior to Plaintiff's alleged onset date.

Plaintiff argues the ALJ failed to recognize Dr. Russell as a treating source and further, the ALJ erred in faulting Dr. Russell for not providing a function-by-function assessment. (Dkt. No. 10 at 11 [Pl.'s Mem. of Law].)

An acceptable medical source is considered a "treating source" where "the medical evidence establishes that [Plaintiff] see[s], or ha[s] seen, the source with a

---

[5] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue,* 546 F.3d 260, 262 n. 1 (2d Cir.2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* at 32 (4th ed.2000)).

[6] The ALJ referred to Exhibit 7F which contained Dr. Russell's 2011 evaluations.

frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [his or her] medical condition(s)." 20 C.F.R. § 416.902. An ALJ "may consider an acceptable medical source who has treated or evaluated [Plaintiff] only a few times or only after long intervals (e.g., twice a year) to be [a] treating source if the nature and frequency of the treatment or evaluation is typical for [Plaintiff's] condition(s)." *Id.*

The Second Circuit has stressed the significance of the ongoing nature of a physician's relationship with a plaintiff in establishing the physician as a "treating physician." *Schisler v. Bowen,* 851 F.2d 43, 46 (2d Cir.1988) In *Schisler*, the Court defined a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler*, 851 F.2d at 46. The Second Circuit stated that a treating physician's opinion is entitled to extra weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops." *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir.1983); *see also Petrie v. Astrue,* 412 F. App'x 401, 405 (2d Cir.2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians). Thus, a key component of the treating physician relationship is the ongoing nature of the treatment between the physician and the plaintiff.

Dr. Russell saw Plaintiff a total of three times, twice in May of 2011 and over a year later in October of 2012. Although Dr. Russell personally examined Plaintiff, administered testing, and provided an opinion regarding Plaintiff's mental health condition, Dr. Russell did not establish a treating relationship with Plaintiff. First and

foremost, there was no ongoing treatment between Dr. Russell and Plaintiff.  Plaintiff did

not seek treatment from Dr. Russell, nor did Plaintiff receive treatment such as

counseling or medication from Dr. Russell.  Dr. Russell's October 2012 evaluation was

conducted on referral by The Star Group.  (T. 359.)[7]  Although Dr. Russell

recommended Plaintiff continue with treatment, he did not take her on a private patient.

(T. 364-365.)  Dr. Russell did not prescribe Plaintiff medication or provide her

counseling.  (*Id.*)   Second, Dr. Russell may have reviewed Plaintiff's medical record;

however, despite hospitalizations for her mental health impairment, Plaintiff did not

receive ongoing mental health counseling or medication management.  Her medical

records up to 2012 contain her mental health hospitalizations and notations of a mental

health evaluations from October of 2001 and from April of 2003.  (T. 355-356, 353-354.)

Plaintiff did not begin, and maintain, mental health counseling until 2013.[8]  To be sure,

lack of ongoing and sustained mental health treatment is not an indication that Plaintiff

did not have severe mental health impairments; however, the issue here is whether the

type of treatment Plaintiff did receive from Dr. Russell rose to the level that would

establish Dr. Russell as a treating physician under the Regulations and case law.  Here,

the evidence does not support Dr. Russell as a treating physician because Dr. Russell

did not have an ongoing treatment relationship with Plaintiff; therefore, the ALJ did not

err in her determination that Dr. Russell was not a treating physician.

Although the ALJ properly concluded Dr. Russell was not a treating source, the

ALJ was still required to follow the factors outlined in 20 C.F.R. 416.927(c)(1)-(6) in

---

[7]      The Star Group: http://thestargroupinc.com.  The Star Group contracts with Broome
County to assist individuals with vocational needs.

[8]      Plaintiff was hospitalized for mental health reasons in 2011, which was in the record and at
which time Dr. Russell met with Plaintiff.  (T. 331, 350.)  However, there is no record on ongoing  outpatient
treatment.

affording Dr. Russell's opinion weight. The relevant factors an ALJ should considered in determining what weight to afford a medical opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. § 416.927(c)(1)-(6). Here, the ALJ based her weight determination on the length, nature and extent of Dr. Russell treatment relationship with Plaintiff, on a GAF score of 60 provided by "practitioners who treat[ed] [Plaintiff] on a regular basis," and on the lack of an "appropriate function-by-function assessment" of Plaintiff's mental work limitations. (T. 20.)

The ALJ noted Dr. Russell's lack of specific functional limitations in her weight analysis. Plaintiff argues that Dr. Russell's failure to provide a function-by-function assessment should not impact the credibility or validity of his evaluation; however Plaintiff does not provide any support for this conclusion. (Dkt. No. 10 at 11 [Pl.'s Mem. of Law].) Although, Dr. Russell's notations did indicate some degree of functional limitations, such as difficulties concentrating and handling stress, Dr. Russell did not provide specific work related functional limitations, instead he concluded Plaintiff was "disabled." (T. 363-364.) The ALJ is responsible for making the determination or decision about whether a plaintiff meets the statutory definition of disability. 20 C.F.R. § 416.927. Therefore, the ALJ did not have to accept Dr. Russell's statement that Plaintiff appeared "severely disabled and should apply for disability." (T. 364.) Additionally, Dr. Russell's observations that Plaintiff would have "difficulties concentrating" was not inconsistent with the ALJ's mental RFC limiting Plaintiff to unskilled work. *See* 20 C.F.R. § 416.968, SSR 85-15.

In weighing Dr. Russell's opinion, the ALJ properly relied on Dr. Russell's limited treatment relationship with Plaintiff, the inconsistencies between Dr. Russell's observations and the observations of Plaintiff's treating mental health providers, and the lack of specific functional limitations provided by Dr. Russell. Further, as discussed in detail herein, substantial evidence supported the ALJ's RFC determination.

ii.)    Dr. Loomis

Dr. Loomis performed a psychiatric consultative exam on January 11, 2013. (T. 418-422.) In a medical source statement, Dr. Loomis opined that Plaintiff could:

> follow and understand simple directions and instructions and perform simple tasks independently. [Plaintiff] [could not] maintain attention and concentration. [Plaintiff] [was] able to maintain a regular schedule and learn new tasks. [Plaintiff] [could] perform complex decisions. [Plaintiff] [could] make appropriate decisions. [Plaintiff] [could not] relate adequately with others or appropriately deal with stress. The difficulties that she has are caused by her psychiatric symptoms.

(T. 421.)

The ALJ afforded "significant weight" to Dr. Loomis's opinion that Plaintiff could follow and understand simple directions and instructions; perform simple tasks independently; maintain a regular schedule; learn new tasks; perform complex tasks independently; and make appropriate decisions. (T. 19.) The ALJ reasoned "significant weight" was appropriate due to Dr. Loomis's "program expertise," and the "relative" consistency of her opinion with the overall medical evidence including conservative treatment and a GAF score of 60. (*Id.*)

The ALJ did not afford weight to Dr. Loomis's opinion that Plaintiff could not maintain attention and concentration; could not relate adequately with others; and could not appropriately deal with stress. (T. 19-20.) The ALJ reasoned that this portion of Dr.

Loomis's opinion was inconsistent with her mental status examination which indicated Plaintiff was cooperative and had adequate social skills. (T. 419.)

Dr. Loomis's conclusions were inconsistent; however, the ALJ provided adequate reasoning for adopting those portions of Dr. Loomis's medical source statement which were supported by her examination and the medical evidence in the record. (T. 20.) An ALJ does not have to strictly adhere to the entirety of one medical source's opinion. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.") The ALJ's RFC determination limiting Plaintiff to unskilled low stress work and only occasional interaction with the public properly accounts for Dr. Loomis's supported limitations.

iii.) Ms. Harding, L.C.S.W.

Ms. Harding provided mental health counseling for Plaintiff beginning in April of 2013. (T. 479.) Ms. Harding completed a mental limitation questionnaire in April 2014. (T. 503-504.) Ms. Harding opined Plaintiff had marked or extreme limitations in the area of concentration and persistence. (T. 503.)[9] Ms. Harding opined Plaintiff had a marked limitation in her ability to interact appropriately with the general public; an extreme limitation in her ability to accept instructions and respond appropriately to criticism from supervisors; and a medium limitation in her ability to get along with co-workers. (*Id.*)

---

[9] The form completed by Ms. Harding provided the following definitions. Medium: "more than slight but less than a serious limitation. The individual is still able to function satisfactorily for certain portion of the day and/or perform the tasks satisfactorily on some of the occasions. The approximate of loss would be more than 20% for the particular activity but less than 1/3 of the day." (T. 503.) Marked: "there is a serious limitations in this area. There is a substantial loss in the ability to effectively function the loss would be greater than 33%." (*Id.*) Extreme: "there is a major limitation in this area. There is no or very little useful ability to function in this area." (*Id.*)

Ms. Harding opined Plaintiff had a marked limitation in her ability to respond appropriately to ordinary stressors in a work setting with simple tasks. (*Id.*) Ms. Harding opined Plaintiff would be "off task" more than 33% of the day and would be absent three or more days per month. (T. 504.)

The ALJ afforded Ms. Harding's opinion "reduced weight." (T. 20.) The ALJ reasoned Ms. Harding was not an acceptable medical source and Ms. Harding's opinions were inconsistent with the longitudinal medical evidence in the record, specifically the opinions of Dr. Loomis and Dr. Kamin, and also inconsistent with Plaintiff's activities of daily living. (*Id.*)

Plaintiff argues the ALJ improperly relied on Ms. Harding's status as a "non-acceptable" source in weighing her opinion. (Dkt. No. 10 at 13 [Pl.'s Mem. of Law].)[10] However, as Defendant properly asserts, in evaluating opinion evidence only "acceptable medical sources" can provide "medical opinions." 20 C.F. R. § 416.927(a)(2). The ALJ properly considered Ms. Harding's role as a non-acceptable medical source in her weight analysis because only acceptable medical sources can provide medical opinions. However, non-acceptable medical sources can provide insight into the severity of an impairment and how it affects the plaintiff's ability to work. SSR 06-3p. The ALJ properly took into consideration Ms. Harding's role as a non-acceptable medical source as well as the factors outlined in 20 C.F.R. § 416.927(c)(3)-(4) in evaluating Ms. Harding's opinion. Therefore, the ALJ did not err in relying on Ms.

---

[10] There are five categories of "acceptable medical sources." 20 C.F.R. § 416.913(a). LCSW are not included within those categories. LCSW are listed among the "other medical sources," whose opinion may be considered as to the severity of a plaintiff's impairment and ability to work, but their conclusions are not entitled to any special weight. *Id.* at § 416.913(d)(1).

Harding's status as a non-acceptable medical source as one factor in her overall weight analysis.

      iv.)   Dr. Kamin

Dr. Kamin completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form in February of 2013. (T. 75, 79-81.) Therein, Dr. Kamin opined that based on the medical evidence in the record at that time, Plaintiff was "not significantly limited" in her ability to remember location and work-like procedures, and in her ability to understand and remember very short and simple instructions. (T. 79.) Dr. Kamin opined that Plaintiff was "moderately limited" in the areas of concentration and persistence. (T. 79.)[11] Dr. Kamin opined that Plaintiff was "moderately limited" in her social interactions. (T. 80.)[12] Dr. Kamin opined that Plaintiff was "moderately limited" in her ability to respond appropriately to changes in the work setting and in her ability to set realistic goals or make plans independently of others. (*Id.*)

The ALJ afforded Dr. Kamin's medical opinion "significant weight," reasoning he had program expertise and his opinion was "relatively" consistent with the overall medical evidence. (T. 19.) The ALJ specifically stated that Dr. Kamin's limitations were incorporated into her RFC determination by limiting Plaintiff to unskilled, low-stress, and

---

[11]    The area of concentration and persistence in which Plaintiff had "moderate" limitations included the ability: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (T. 79.) The term "moderate" is not defined.

[12]    The area of social interaction in which Plaintiff had "moderate" limitations included the ability: to interact appropriately with the general public; ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (T. 80.)

low-contact work.  (T. 20.)  Plaintiff argues the ALJ erred in affording Dr. Kamin's opinion significant weight because Dr. Kamin never examined Plaintiff, Dr. Kamin's opinions were contrary to Ms. Harding and Dr. Loomis, and Dr. Kamin's assessment "did not satisfy the standards of competent medical opinion."  (Dkt. No. 10 at 14-15 [Pl.'s Mem. of Law].)

Plaintiff then proceeds to argue that the ALJ erred in his assessment of Dr. Kamin's opinion regarding Plaintiff's limitations in attention and concentration, which Plaintiff interprets as being "off task," or absent; and further, urges the adoption of Dr. Kamin's opinion in this area because it is "100 percent" consistent with the opinions of all other providers.  (Dkt. No. 10 at 15 [Pl.'s Mem. of Law].)

First, the ALJ's reasoning for the weight she provided Dr. Kamin's opinion was proper.  An ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the opinion is supported by the weight of the evidence.  *Garrison v. Comm'r of Soc. Sec.*, No. 08-CV-1005, 2010 WL 2776978 at *4 (N.D.N.Y. June 7, 2010).  Therefore, reliance on a non-examining medical source in and of itself is not grounds for remand.

Further, Dr. Kamin's limitations were not contrary to other medical opinion evidence in the record and supported the ALJ's mental limitations to unskilled work.[13] For example, Dr. Kamin and Dr. Loomis both opined Plaintiff was capable of following

---

[13]     Plaintiff failed to provide any support for his argument that Dr. Kamin's opinion that Plaintiff was "moderately" limited  in the area of concentration and persistence equates to Plaintiff being off task greater than 10 percent of the work day and absent more than one day per month.  (Dkt. No. 10 at 17 [Pl.'s Mem. of Law].)  Plaintiff asserts Dr. Kamin's limitation in this area was supported by Dr. Loomis and Ms. Harding, but for the reasons stated herein, the ALJ afforded proper weight the opinion of Dr. Loomis regarding Plaintiff's limitations and the ALJ afforded proper weight to the opinion Ms. Harding.

and understanding simple directions and simple tasks. (T. 79, 420.) A limitations to simple directions and simple tasks is consistent with unskilled work. SSR 85-15 states:

> [t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

Further, Dr. Kamin's limitations were reflected in the ALJ's mental RFC which limited Plaintiff to unskilled, low-stress, and low-contact work. Therefore, the ALJ did not err in the weight afforded to Dr. Kamin's opinion.

To be sure, the record regarding Plaintiff's mental health treatment was sparse. While there is no question that Plaintiff suffered from severe mental health impairments which affect her ability to work, it was ultimately the ALJ's responsibility to formulate Plaintiff's RFC. The RFC determination must be supported by substantial evidence, which the Second Circuit has concluded "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004), *citing Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Although the record contained opinions with limitations greater than those in the ALJ's RFC determination, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford*, 685 F.2d at 62.

**B.      Whether the ALJ Properly Considered Plaintiff's Diagnosis of Somatic Disorder**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 11 at 9-10, 17-22 [Def.'s Mem. of Law].) The Court adds the following analysis.

Plaintiff argues the ALJ failed to consider Plaintiff's somatic disorder which was diagnosed by Dr. Russell. (Dkt. No. 10 at 18-19 [Pl.'s Mem. of Law].) Any error to properly evaluated somatic disorder was harmless. First, at step two, the ALJ determined Plaintiff had mental health impairments which were severe. In addition, "[w]here an ALJ has omitted an impairment from step two of the sequential analysis, other courts have declined to remand if the ALJ clearly considered the effects of the impairment in the remainder of his analysis." *Chavis v. Astrue*, No. 07-CV-0018, 2010 WL 624039, at *12 (N.D.N.Y. Feb.18, 2010); *Lasiege v. Colvin*, No. 12-CV-01398, 2014 WL 1269380, at *10-11 (N.D.N.Y. Mar. 25, 2014); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding the alleged step two error harmless because the ALJ considered the plaintiff's impairments during subsequent steps); *see also* 20 C.F.R. § 416.923 (stating that the ALJ is required to consider the "combined effect of all of [plaintiff's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity"). It has been well established that "[b]ecause step two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements." *Kessler v. Colvin*, 48 F.Supp.3d 578, 593 (S.D.N.Y. 2014) (*citing Fortier v. Astrue*, No. 10-CV-01688, 2012 WL 3727178, at *9 (D. Conn. May 11, 2012)). Further, the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or

impairment" is not, itself, sufficient to deem a condition severe. *McConnell v. Astrue,* 2008 WL 833968, at *2 (N.D.N.Y.2008) (citing *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995)). The ALJ determined Plaintiff had severe mental impairments at step two, thus allowing the sequential process to proceed. Any error at step two to specifically find Plaintiff's somatic disorder severe was therefore harmless.

Further, any error to consider a somatic disorder at step three was also harmless. The ALJ stated that in finding Plaintiff had severe mental impairments, "however characterized," she considered all symptoms affecting Plaintiff's mental functioning in her analysis. (T. 14.) Listing 12.07: Somatoform Disorders, requires a plaintiff to have two of the following: marked limitations in activities of daily living; marked difficulties in social functioning; marked difficulties in concentration, persistence, and pace; and repeated episodes of decompensation, each of extend duration. The ALJ evaluated these areas in her step three analysis regarding Plaintiff's mental impairments under Listings 12.04, 12.06, and 12.08. (T. 15.) The ALJ determined Plaintiff had mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and one to two episodes of decompensation more than a year prior to the application date. (T. 15-16.) Therefore, because the ALJ evaluated the areas required under Listing 12.07 in her step three analysis, any error in failing to specifically evaluate a somatic disorder under 12.07 was harmless.

Plaintiff also argues the ALJ failed to take into consideration the "nexus" of Plaintiff's somatic disorder and her physical impairments, specifically, Dr. Gray's opinion that Plaintiff would be "off task" more than 33 percent of the day. (Dkt. No. 10 at 19

[Pl.'s Mem. of Law].)  Plaintiff asserts Dr. Gray's opinion is based on a "combination of physical and emotional problems;" however, Dr. Gray's questionnaire form stated Plaintiff was diagnosed with, and being treated for, lumbar disc disorder with nerve compression.  (T. 485.)  Nowhere on the form did Dr. Gray indicate he treated Plaintiff for, or was aware of, any mental health conditions.  Therefore, the ALJ did not fail to recognize link between Plaintiff's physical back condition and any mental condition based on Dr. Grey's opinion, because the record failed to prove Dr. Grey's opinion was based on more than Plaintiff's physical impairment alone.

### C.  Whether the ALJ Erred at Step Five

 After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 11 at 22-23 [Def.'s Mem. of Law].)  The Court adds the following analysis.

Because we find no error in the ALJ's RFC assessment for the reasons stated in Parts IV.A-B, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record).

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO**

**THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (*citing Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  December 2, 2015

William B. Mitchell Carter
U.S. Magistrate Judge